# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF KENTUCKY
### LOUISVILLE DIVISION

MAYA MOSS; LEXINGTON FAIR HOUSING
COUNCIL; FAIR HOUSING CENTER OF WEST
MICHIGAN; NATIONAL FAIR HOUSING
ALLIANCE, INC.

                                  CIVIL ACTION NO.:   3:18-cv-487-DJH

                     Plaintiffs,

     v.

ASSET CAMPUS HOUSING, INC.,

                     Defendant.

## COMPLAINT AND JURY DEMAND

1. Plaintiffs Maya Moss, the Lexington Fair Housing Council ("LFHC"), the Fair Housing
Center of West Michigan ("FHCWM"), and the National Fair Housing Alliance ("NFHA")
(collectively "Plaintiffs") bring this action for declaratory judgment, injunctive relief, and
damages against Defendant Asset Campus Housing, Inc. ("Asset Campus Housing") for
discrimination on the basis of familial status in the provision of rental housing, in violation of the
Fair Housing Act ("FHA"), 42 U.S.C. § 3601, *et seq.*

2. Defendant Asset Campus Housing is a private, rental management company that owns
and/or manages hundreds of multi-family properties across the country, including in Louisville,
Kentucky.  It advertises itself as the largest third-party property management company of
"student housing" in the country.

3. Despite advertising that it provides "student housing," Defendant does not rent exclusively to students. Defendant does not routinely require prospective tenants to be students in order to qualify to rent housing, does not request proof of enrollment in order to sign a lease, and is aware that tenants who are not students reside at its properties. Rather, students are Defendant's desired tenant population.

4. Defendant, however, has a certain population of residents that it prefers to rent to—young adult, single tenants, as opposed to tenants with children.

5. In order to attract its desired population of single tenants without children, Defendant has implemented, maintained, and enforced a one-person per bedroom maximum occupancy policy at its properties that has the purpose and effect of excluding families with children from renting.

6. Under Defendant's one-person per bedroom occupancy policy, each tenant must rent his or her own bedroom, and each bedroom is the subject of a separate lease agreement. Under this policy, families with children have to pay the full amount of rent for each child in the household, even though the bedrooms at Defendant's properties are large enough to accommodate more than one occupant, per local occupancy ordinances or otherwise. Accordingly, pursuant to Defendant's one-person per bedroom occupancy policy, a single tenant with a young child would be forced to sign two lease agreements (one for each bedroom) at Defendant's property, and thus required to pay double the rent, as opposed to being allowed to share a large bedroom with the young child.

7. Even in instances in which a family with children is willing to rent every bedroom in Defendant's apartment unit, and pay rent for each bedroom, Defendant persists in enforcing its one-person per bedroom policy in a manner that operates to exclude families with children from its housing. That is, a couple that is willing to rent an entire two-bedroom apartment from

Defendant, even at the price Defendant is asking, still cannot have a child reside in the apartment because under Defendant's one-person per bedroom occupancy policy, three occupants cannot rent a two-bedroom apartment. Defendant applies this occupancy policy regardless of the size of the apartment or of its bedrooms.

8. As a result of Defendant's unlawful occupancy policy, Plaintiff Maya Moss was forced to lease and pay for two bedrooms at Defendant's property in Louisville, Kentucky for herself and her (then) two-year old child, despite the fact that her bedroom alone is large enough to comfortably accommodate her and her child.

9. In an investigation that collectively spanned over a year, LFHC, FHCWM, and NFHA (collectively, the "Organizational Plaintiffs") conducted testing and amassed significant evidence establishing that Defendant targets a desired tenant population and institutes an unreasonable occupancy policy that excludes and/or limits the number of families with children at its properties.

10. Indeed, during one test, in response to the tester revealing that she had children, a rental agent at Defendant's property said: "this is probably not where you want to live." These and other statements made during the course of the testing—including statements that Defendant does not allow children under 18 to use amenities at its properties and other statements made in an effort to steer prospective tenants with children to seek housing at other properties— evidences intentional discrimination against families with children.

11. By enforcing its occupancy policy, Defendant intentionally discriminates against families with children by purposefully erecting barriers that preclude such families from obtaining rental housing. Defendant's policy also has an unlawful disparate impact on families with children, who are far more likely to be excluded from Defendant's rental housing as a result of the one-

person per bedroom occupancy policy than households without children. As a result, Plaintiffs bring this action to remedy Defendant's unlawful conduct.

## JURISDICTION AND VENUE

12. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 2201, 2202, and 1343, and 42 U.S.C. § 3613(a).

13. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the Defendant does business in this District (namely, Louisville, Kentucky), the Defendant is subject to personal jurisdiction in this District, a substantial part of the events giving rise to these claims occurred in this District, and a substantial part of the property that is the subject of these claims is located in this District.

## PARTIES

14. Plaintiff Maya Moss resides at 2501 South 4th Street, Louisville, Kentucky (Jefferson County), in an apartment complex (The Arch) that is owned and/or managed by Defendant. Ms. Moss has a three-year-old child who resides with her.

15. Plaintiff Lexington Fair Housing Council ("LFHC") is a non-profit corporation organized under the laws of Kentucky with its principal place of business in Lexington, Kentucky. LFHC is the only private non-profit based in Kentucky dedicated to ending housing discrimination on the basis of all protected characteristics, including familial status. LFHC conducts training and fair housing seminars to educate the public, government agencies, and real estate professionals on their rights and obligations under fair housing laws; investigates complaints of housing discrimination; and provides advocacy and legal assistance to people who have been victims of housing discrimination, among other activities.

16. Plaintiff Fair Housing Center of West Michigan ("FHCWM") is a non-profit corporation organized under the laws of Michigan that is committed to preventing and eliminating illegal housing discrimination, including discrimination against families with children, and to ensuring equal housing opportunity in western Michigan. FHCWM maintains an office in Grand Rapids, Michigan, and services 12 counties in western Michigan. FHCWM undertakes various activities to further its mission, including tracking and investigating allegations of housing discrimination; assisting individuals as they report housing discrimination; surveying property marketing and other housing practices; training landlords, realtors, and others on fair housing practices; and building awareness and support for fair housing in the western Michigan community.

17. Plaintiff National Fair Housing Alliance, Inc. ("NFHA") is a national, non-profit public service organization incorporated under the laws of the Commonwealth of Virginia with its principal place of business in Washington, DC. NFHA is a consortium of 220 private, non-profit organizations, state and local civil rights agencies, and individuals from throughout the United States. NFHA is a nationwide alliance of private, non-profit, fair housing organizations, including organizations in 28 states. NFHA is the only national organization dedicated solely to ending housing discrimination, including discrimination against families with children. NFHA works throughout the United States to eliminate housing discrimination and to ensure equal opportunity for all people through leadership, education and outreach, membership services, public policy initiatives, advocacy, investment in community development and stabilization projects, and enforcement.

18. In addition to the activities described above, the Organizational Plaintiffs also investigate fair housing violations through their respective testing programs. Testers are individuals who pose as prospective renters and buyers for the purpose of obtaining information about the

conduct of landlords, real estate companies, agents, or other housing providers to determine whether illegal housing discrimination is taking place. Testing occurs under controlled conditions to target and isolate potentially unlawful conduct.

19. Defendant Asset Campus Housing, Inc. ("Defendant" or "Asset Campus Housing") is a housing management company that is headquartered in Houston, Texas and registered to do business in Kentucky. Its registered agent address for service of process in Kentucky is 421 West Main Street, in Frankfort, Kentucky. Defendant markets itself as providing off-campus "student housing." According to Defendant, it is the largest third-party student housing management company in the country, with a portfolio of over 200 properties.

20. At all times relevant to this action, Defendant owned and/or managed The Arch in Louisville, Kentucky, where Ms. Moss resides, as well as the properties at which the Organizational Plaintiffs conducted their testing and investigation. Upon information and belief, Defendant is responsible for implementing, maintaining, and/or enforcing the one-person per bedroom occupancy policy at issue in this Complaint, as well as other rules and policies concerning children and families with children at its properties.

21. In acting or omitting to act as alleged herein, Asset Campus Housing acted through its employees and/or agents, and is responsible for the acts and omissions of its employees and/or agents within the scope of their employment or agency. In acting or omitting to act as alleged herein, each employee or officer of Asset Campus Housing was acting within the course and scope of his or her actual or apparent authority pursuant to such agencies, or the alleged acts or omissions of each employer or officer as agent was subsequently ratified and adopted by Asset Campus Housing as principal.

# FACTUAL ALLEGATIONS

22. Defendant Asset Campus Housing is a private rental management company that owns and/or manages hundreds of multi-family properties across the country.  Defendant's properties offer spacious floorplans and attractive amenities.  It advertises itself as the largest third-party provider of student housing in the country.

23. Despite advertising that it provides "student housing," Defendant does not rent exclusively to students.  Defendant does not routinely require prospective tenants to be students in order to qualify to rent housing, does not request proof of enrollment in order to sign a lease, and is aware that tenants who are not students reside at its properties.  Rather, students are Defendant's desired tenant population.

24. Defendant, however, has a certain population of residents that it prefers to rent to—young adult, single tenants, as opposed to tenants with children.

25. In order to attract its desired population of single tenants, Defendant has implemented, maintained, and enforced policies that have the purpose and effect of excluding or limiting the number of families with children at its properties.  Namely, Defendant has implemented an unduly restrictive occupancy policy that only permits one-person per bedroom to reside in its apartment units. Under Defendant's policy, each tenant must rent his or her own bedroom, and each bedroom must be the subject of a separate lease agreement.

26. Defendant enforces the same rigid and unreasonable one-person per bedroom occupancy policy, regardless of the size of the unit or its bedrooms.  Indeed, Defendant's maximum occupancy policy is substantially more restrictive than local occupancy guidelines, which set the minimum area requirements and maximum occupancy limitations for housing in any given jurisdiction.  In some instances, local occupancy standards would permit as many as three times

the amount of residents to safely occupy one of Defendant's units than Defendant's one-person per bedroom occupancy policy allows.

27. Accordingly, pursuant to Defendant's one-person per bedroom occupancy policy, a single tenant with a young child would be forced to lease two separate bedrooms at Defendant's property, and thus pay double the rent, as opposed to being allowed to share a large bedroom with the young child. Upon information and belief, Defendant was aware that such a restrictive occupancy policy would discourage, and often preclude, families with children from renting from it, but it implemented the policy nonetheless because it prefers to rent to single tenants without children.

28. Even in instances in which a family with children is willing to rent every bedroom in Defendant's apartment unit, and pay rent for each bedroom, Defendant still enforces its one-person per bedroom policy in a manner that operates to exclude families with children from renting from it. That is, a couple that wants to rent an entire two-bedroom apartment from Defendant, even at the price Defendant is asking, still cannot have a child reside in the apartment with them because under Defendant's one-person per bedroom occupancy policy, three occupants cannot rent a two-bedroom apartment. Defendant's restrictive occupancy policy has the purpose and effect of excluding families with children from rental housing and has a disproportionate adverse impact on families with children.

29. In an investigation that collectively spanned over a year, the Organizational Plaintiffs amassed significant evidence establishing that Defendant discriminates against families with children by enforcing its one-person per bedroom occupancy policy. This includes evidence of Defendant's discriminatory statements against families with children, as well as evidence of

unlawful rules and restrictions that Defendant imposes at its properties that discourage families with children from renting Defendant's units and ultimately make housing unavailable to them.

30. Defendant's discriminatory policy has impacted families with children, including Plaintiff Maya Moss, who confronted Defendant's discrimination in Louisville, Kentucky.

## Defendant Enforces Its One-Person Per Bedroom Policy Against Maya Moss

31. Ms. Moss is 21 years old. She has a three-year old child. Since August 2017, she has resided at 2501 South 4th Street, in Louisville, Kentucky, in an apartment complex called The Arch that is owned and/or managed by Defendant.

32. At the time that she first learned of The Arch, Ms. Moss was enrolled as a student at the University of Louisville and was looking to rent an apartment for herself and her (then) two-year old child. Affordable and available options, that were also close enough to campus to allow her to attend classes, were limited.

33. She came across The Arch during her search for housing. She was particularly interested in renting a bedroom there because of its close proximity to campus and its spacious floor plans.

34. However, just before Ms. Moss was about to sign the lease, she learned that Defendant enforced a one-person per bedroom occupancy policy at The Arch. An agent and/or employee of Defendant informed her that if she planned to have her (then two-year old) child living with her in the apartment, she would need to execute a separate lease for a second bedroom for the child to occupy. She also learned that she would be required to pay the full lease amount for the child's bedroom; that is double the rent.

35. With school starting, limited housing options, and a child for which she needed to provide housing, Ms. Moss felt as if she had no choice but to sign the leases for her and her child and pay the extra fees associated with having to rent two bedrooms at The Arch.

36. During the time that she has lived at The Arch, it has been a significant financial hardship for Ms. Moss to pay double the amount of rent for two bedrooms. She has complained to Defendant's corporate office in an effort to see if an exception to Defendant's occupancy policy can be made to permit her to occupy a room with her young child, but has failed in convincing Defendant to do so. Housing options in the area remain limited, making it difficult for her to identify and find alternative options.

37. Around the same time that Ms. Moss fell victim to Defendant's discrimination, the Organizational Plaintiffs were conducting their investigation of Defendant's policies and practices. A description of the Organizational Plaintiffs' investigation follows below.

**The Fair Housing Center of West Michigan Initiates Investigation of Defendant's Practices**

38. In or around March 2017, FHCWM received a complaint alleging potential discrimination on the basis of familial status from a resident of Copper Beech Townhomes Mount Pleasant ("Copper Beech"), a multi-family housing complex in Mount Pleasant, Michigan owned and/or managed by Defendant Asset Campus Housing.

39. As is the case with other properties owned and/or managed by Asset Campus Housing, Defendant rented by the bedroom at Copper Beech. The rental price was assessed per bedroom, and separate lease agreements were required to be executed for each bedroom per Defendant's one-person per bedroom occupancy policy.

40. The resident reported to FHCWM that he had been renting a single bedroom in a two-bedroom townhome at Copper Beech. At the time that he contacted FHCWM, he did not have any roommate; the second bedroom was locked and unoccupied.

41. The resident wanted to renew his lease at Copper Beech and have his girlfriend and her 11-year old daughter move into the townhome with him. Accordingly, the resident contacted the leasing office to inquire whether he could lease the second bedroom in the townhome.

42. Although Copper Beech marketed itself as "student housing," the property did not routinely or uniformly enforce any requirement that tenants must also be students, and did not request proof of enrollment prior to signing any lease. Upon information and belief, tenants who are not students reside at Copper Beech, and Defendant is aware of the fact that these tenants are not enrolled in any educational program.

43. The resident reported to FHCWM that he went to the rental office to speak to a manager and inquire whether he could rent the entire two-bedroom townhome for himself and his girlfriend. Initially the manager told the resident that it would be no problem for him to lease the entire unit, however, the manager's position changed when the resident revealed that a child would also be living in the townhome. The manager made clear to the resident that Defendant enforced a one-person per bedroom occupancy policy at the housing complex and, accordingly, two adults and a child could not live in a two-bedroom townhome. As a result, pursuant to Defendant's occupancy policy, the resident's girlfriend could not move into the townhome if her child would also be living in the unit.

44. In response to the resident's call, FHCWM conducted an initial assessment of the complaint and realized that it had previously obtained information about Defendant's one-person per bedroom policy through systemic testing it conducted at another property owned and/or managed by Defendant. Having separately received information concerning Defendant's discrimination at two different properties, FHCWM opened a more expansive investigation of

Defendant to confirm the resident's allegations and ascertain the nature and extent of any other discrimination by Defendant in FHCWM's service area.

45. As part of its investigation of Asset Campus Housing, FHCWM obtained Defendant's written rental criteria for Copper Beech. The rental criteria confirmed that Asset Campus Housing enforced a one-person per bedroom occupancy policy at the property.

46. FHCWM also conducted research and investigation to determine whether any local occupancy restrictions or building codes could explain or justify Defendant's one-person per bedroom occupancy policy. Local occupancy and/or building codes often provide maximum occupancy guidelines for residential housing complexes by jurisdiction and are generally enacted to prevent overcrowding and promote safety.

47. Rather than providing any justification for Defendant's policy, FHCWM found that Defendant's occupancy policy at Copper Beach was significantly more restrictive than the maximum occupancy limitations imposed by local code.

48. Copper Beach Townhomes Mount Pleasant is located in Union Charter Township. Union Charter Township has adopted the 2012 International Property Maintenance Code ("2012 IPMC"), a model code that sets occupancy limitations by room.

49. Under the 2012 IPMC, each bedroom in a dwelling is required to have a minimum of 70 square feet and every bedroom occupied by more than one person must contain a minimum of 50 square feet per occupant. 2012 IPMC § 404.4.1.

50. FHCWM obtained and analyzed floor plans at Copper Beech to determine the maximum number of occupants that would be permitted to live in one of its two-bedroom floorplans under the 2012 IPMC. As illustrated in the Table below, the 2012 IPMC would permit three times the

number of occupants that Defendant would allow to rent a two-bedroom townhome at Copper Beech.

| Floorplan | Total sq. ft. (advertised) | Bedroom 1 - sq. ft. | # of occupants allowed in Bedroom 1 | Bedroom 2 - sq. ft. | # of occupants allowed in Bedroom 2 | Living/ Dining sq. ft.[1] | Total # occupants permissible under applicable local code | Total # occupants permissible under Defendant's policy |
|---|---|---|---|---|---|---|---|---|
| 2 bedroom/2.5 bath | 1300 | 189 | 3 | 172 | 3 | 249 | 6 | 2 |

51. FHCWM conducted further investigation to determine whether Defendant owned and/or managed any other properties in its service area, as well as whether Defendant similarly enforced its one-person per bedroom occupancy policy at any other property that it owned and/or managed. In the course of its investigation to ascertain information about other properties owned and/or managed by Defendant, FHCWM, for example, obtained written rental criteria for Copper Beech Townhomes in Allendale, Michigan—another private apartment complex that Defendant marketed as "student housing." The written rental criteria for Copper Beech Allendale confirmed that Defendant similarly enforced its one-person per bedroom policy at that housing complex.

52. FHCWM also conducted testing at properties owned and/or managed by Defendant to determine whether Defendant's one-person per bedroom occupancy policy was enforced in a manner that limited the availability of housing to families with children.

---

[1] Under the 2012 IPMC, the minimum area requirements for a living room for 1-2 occupants is 120 square feet; for 3-5 occupants is also 120 square feet; and for 6 or more occupants is 150 feet. Table 404.5. For dining rooms, the minimum area requirement for 3-5 occupants is 80 square feet and for 6 or more occupants is 100 square feet (there is no minimum requirement for 1-2 occupants). *Id.* The Table above reflects combined living and dining room space.

53. For example, in or around June 2017, FHCWM conducted testing at The Reserve at Mount Pleasant ("The Reserve"), another "student housing" complex owned and/or managed by Defendant in Mount Pleasant, Michigan. Upon information and belief, like Copper Beech, Defendant does not enforce a requirement that any prospective tenant be a student in order to qualify to rent housing at The Reserve.

54. After developing a test profile, FHCWM instructed its tester to contact The Reserve posing as a married woman seeking to rent a two-bedroom apartment for her family of three, which included a three-year old child.

55. The tester contacted The Reserve by telephone and spoke to a rental agent who, upon information and belief, was an employee and/or agent of Defendant. The tester told the agent that she was looking to rent a two-bedroom apartment for herself, her husband, and her young child. The agent confirmed that Defendant enforced the same discriminatory policy at The Reserve that was enforced at Copper Beech, telling the tester that her family could not rent a two-bedroom unit because of Defendant's "one head per bedroom" policy. The agent informed the tester that she would need to rent a three-bedroom apartment if she intended to live with her husband and child, which would be over $400 more per month to rent than the two-bedroom apartment that the tester inquired about renting.

56. Upon information and belief, the two-bedroom units at The Reserve are large enough to accommodate more than one-person per bedroom under the applicable local code.

57. FHCWM also conducted testing at 48 West in Allendale, Michigan, another property owned and/or managed by Defendant Asset Campus Housing, to determine whether Defendant similarly enforced its one-person per bedroom occupancy policy in a manner that limited the availability of rental housing to families with children.

58. In June 2017, FHCWM instructed a tester to contact 48 West to inquire about renting a two-bedroom apartment for herself and her two small children.  Again, Defendant's rental agent told FHCWM's tester that her family could not rent a two-bedroom apartment because of Defendant's one-person per bedroom occupancy policy.  The rental agent further told the tester that the only apartment that her family would be permitted to rent at the complex was a four bedroom apartment unit that would cost $1,000 more for her family to rent per month than the two-bedroom apartment that the tester wanted to rent.

59. FHCWM obtained floorplans for 48 West to ascertain the size of the units and conduct a comparison between Defendant's occupancy policy and any limitations imposed by the applicable local code.

60. 48 West is located in Allendale Charter Township, which has adopted the 2015 International Property Maintenance Code ("2015 IPMC") as its local occupancy code.  Under the 2015 IPMC, like the 2012 IPMC referenced above, there must be at least 50 square feet of floor space for every occupant of a bedroom apartment unit. 2015 IPMC § 404.4.1.  That is, in order to accommodate two occupants in a bedroom, there must be at least 100 square feet of floor space in the bedroom.

61. Through its research and investigation, FHCWM confirmed that Defendant's occupancy policy at 48 West was significantly more restrictive than occupancy limitations imposed by local occupancy standards.  FHCWM's research and findings (for available two-bedroom floor plans at 48 West) are summarized in the Table below.

| Floorplan | Total sq. ft. | Bedroom 1 sq. ft. | # of occupants allowed in Bedroom 1 | Bedroom 2 sq. ft. | # of occupants allowed in Bedroom 2 | Total # occupants permissible under applicable local code[2] | Total # occupants permissible under Defendant's policy |
|---|---|---|---|---|---|---|---|
| Townhome | 1,142 | 123 | 2 | 124 | 2 | 4 | 2 |
| Village Center | 1,152 | 143 | 2 | 138 | 2 | 4 | 2 |

62. After confirming that Defendant enforced a one-person per bedroom occupancy policy at a number of its properties, and learning through its investigation that Defendant owned and/or managed rental properties across the country, FHCWM contacted NFHA to expand the scope of its investigation. NFHA worked with LFHC to investigate Defendant's conduct in Kentucky.

**The Lexington Fair Housing Council Investigates Defendant's Discriminatory Policy**

63. In the course of its investigation of Defendant in Kentucky, LFHC similarly found that Defendant discriminated on the basis of familial status by maintaining and enforcing its restrictive, one-person per bedroom occupancy standard.

64. As part of its investigation, LFHC developed testing profiles and coordinated tests to determine whether Defendant routinely enforced its one-person per bedroom occupancy policy in Kentucky. LFHC confirmed that it did. Through telephone contacts that its testers made with Defendant in March 2018, LFHC confirmed that Defendant enforced its one-person per bedroom policy at a number of its properties, including Campus Pointe Apartments (in Bowling Green, Kentucky) and The Crown Apartments (also in Bowling Green, Kentucky).

---

[2] The minimum area requirements for living room and dining room space for these floorplans meet the minimum floor space required for total number of occupants in this column.

65. In its initial telephone contacts with Defendant, through Defendant's agents and/or employees at these properties, Defendant's employees confirmed that these properties enforce a one-person per bedroom occupancy policy and each tenant was thus required to occupy his or her own bedroom.

66. LFHC also confirmed, through its testing and investigation, that Defendant does not require that prospective tenants be enrolled in school in order to rent housing from Defendant, despite the fact that it advertises that it provides "student housing."

67. Beyond confirming that Defendant enforces its occupancy policy, LFHC also uncovered additional, direct evidence of discrimination against families with children through testing that it conducted at University Trails, an apartment complex that Defendant owns and/or manages in Lexington, Kentucky. LFHC conducted its testing at University Trails on March 2018.

68. After developing a test profile, LFHC first instructed its tester to contact University Trails by telephone to ascertain information concerning Defendant's occupancy policy and the availability of two-bedroom apartments for rent at the property. This initial telephone contact was a control test—the tester was not in a protected class with respect to familial status (part of a family with children under the age of 18 in the household), rather a mother calling to inquire about housing for her college-aged daughters.

69. During the initial telephone contact with LFHC's tester, an agent and/or employee of Defendant both confirmed that Defendant enforced a one-person per bedroom occupancy policy and that two-bedroom apartments were available for rent.

70. After confirming that Defendant had two-bedroom apartments available for rent, LFHC also conducted an on-site test. LFHC developed a test profile and instructed a tester to visit University Trails in person posing as a mother seeking to rent housing for herself and her two

young children. The test revealed evidence suggesting that Defendant does not rent to families with children at University Trails at all.

71. During the on-site visit, the tester met with an employee of Defendant, viewed an available two-bedroom unit, and told him that she was looking to rent a two-bedroom apartment for herself and her two sons (ages three and four).

72. However, when the tester contacted the employee the following day to confirm the rental price for the unit, the employee, after having a discussion with a manager, told the tester that she would not be able to rent a unit at University Trails if she had children in her household. Defendant's employee told LFHC's tester that the property did not have insurance to cover occupants under the age of 16, and thus he could not rent any housing to her. When the tester asked if an exception could be made, the employee again spoke with his manager and told her that there was nothing that could be done—apologizing for not having accurate information when she met with him in person to tour the apartment.

**The National Fair Housing Alliance Uncovers Additional Evidence of Defendant's Discrimination**

73. NFHA also investigated and conducted testing of properties that Defendant owned and/or managed in Kentucky to ascertain the nature and extent of Defendant's discrimination.

74. NFHA's investigation similarly revealed not only that Defendant enforced its one-person per bedroom policy in a manner that limited the availability of housing to families with children, but that Defendant, through its employees and/or agents, actively discouraged families with children from renting from it in flagrant violation of the Fair Housing Act.

75. For example, in or around October 2017, NFHA conducted testing at The Nine, an apartment complex that Defendant owned and/or managed in Louisville, Kentucky.

76. After developing its test profile, NFHA instructed its tester to contact The Nine posing as a woman seeking a two-bedroom apartment for herself and her two young children.

77. NFHA's tester went to The Nine, spoke to an employee and/or agent of Defendant, and asked questions about Defendant's rental criteria. Like Defendant's other properties, while Defendant markets The Nine as being "student housing," the employee confirmed that Defendant does not require proof of enrollment in order to sign a lease or otherwise require prospective tenants to be students in order to rent housing.

78. However, when NFHA's tester revealed that she had two children, the employee responded "this is probably not where you want to live," attempting to steer her away from applying for the rental housing.

79. In addition to discouraging the tester by telling the tester that she would not want to live at the property, the employee confirmed that Defendant enforced a one-person per bedroom policy, that she would have to lease separate rooms for each of her children, and that she would thus be required to rent a three-bedroom apartment. The employee further remarked that it would be "pricey" for her family to rent an apartment from Defendant because she would be required to pay for each room that she had to rent under Defendant's occupancy policy.

80. The employee further confirmed that all of Defendant's properties in the area enforced similar requirements. The employee specifically mentioned The Arch, the property in which Ms. Moss resides, as a property managed by Defendant that similarly enforced its one-person per bedroom occupancy rule.

81. Ultimately, Defendant's employee suggested that the tester apply to rent housing from providers other than Defendant.

82. NFHA also conducted additional investigation to ascertain information about the size and configuration of the two-bedroom apartment that its tester had initially inquired about renting. NFHA obtained this information by contacting The Nine to inquire about the square footage of Defendant's two-bedroom apartments. An agent of Defendant informed NFHA's tester that the bedrooms were "rather large" and approximately 250 square feet. Notably, Louisville's Property Maintenance Code would permit more than one person to occupy a bedroom at The Nine, specifically providing that "[e]very bedroom occupied by one person shall contain at least 70 square feet…of floor area, and every bedroom occupied by more than one person shall contain at least 50 square feet…of floor area for each occupant thereof." LMCO § 156.103(D)(1).

83. NFHA also conducted testing at University Trails, an apartment complex owned and/or managed by Defendant in Lexington, Kentucky that LFHC had previously tested, to determine whether its testing would similarly reveal additional evidence of intentional discrimination against families with children. In or around May 2018, NFHA instructed its tester to contact University Trails to inquire about renting a two-bedroom unit for herself and her twin sons. Again, during the course of NFHA's test, Defendant made direct, discriminatory statements about families with children, expressing intentional discrimination on the basis of familial status.

84. For example, an agent and/or employee of Defendant confirmed to NFHA's tester that Defendant enforced a one-person per bedroom occupancy policy at the property. The agent explained that because of this policy, her two boys would need separate rooms, which would require her to rent a three-bedroom apartment. The employee further represented that the tester would be required to pay approximately $1500 per month in rent, which was outside the budget NFHA provided to the tester as part of the testing profile. When NFHA's tester told the

employee that her children had always shared a room and asked whether the policy could be waived, the employee made clear that no exceptions would be made.

85. University Trails offers spacious floorplans, including two-bedroom apartment units that are around or exceed 900 square feet. Upon information and belief, the bedrooms are sufficiently large enough to permit more than one person to comfortably occupy them, and local occupancy standards for Lexington, Kentucky would permit more than one person per bedroom at University Trails.

86. Defendant's employee made additional statements evidencing discrimination on the basis of familial status. At one point during the test, Defendant's employee explained to NFHA's tester that any other tenant would have to be "okay" with her living in the apartment unit with her children in order for a rental arrangement with Defendant to work.

87. When NFHA's tester expressed disappointment because Defendant's one-person per bedroom rule precluded her from renting the two-bedroom unit that she could afford, Defendant's agent made additional statements about other policies that discriminate on the basis of familial status. Specifically, when the tester explained that she was attracted to the property because she thought her children would enjoy the pool, Defendant's employee explained that children under the age of 18 were not permitted to use the pool or any amenities at Defendant's property—even with adult supervision. These types of restrictive and overbroad rules that preclude children from accessing amenities or certain areas of rental housing discourage families with children from renting dwellings and ultimately make housing unavailable to families with children.

**Defendant's One-Person Per Bedroom Policy Discriminates on the Basis of Familial Status**

88. Plaintiffs' collective encounters with Defendant establish that Defendant enforces a restrictive occupancy policy that has the purpose and effect of discriminating against families with children.

89. Defendant targets a desired tenant population (single tenants without children) and through its unreasonable occupancy policy seeks to exclude and/or limit the number of families with children at its properties. Statements made during the course of the Organizational Plaintiffs' testing—including statements that Defendant does not allow children under 18 to use amenities and that Defendant will not rent to households with children under the age of 16— evidence intentional discrimination against families with children.

90. Defendant's one-person per bedroom policy also has an unlawful disparate impact, and discriminatory adverse effect, on families with children. Defendant's policy, both actually and predictably, results in discrimination.

91. Defendant's enforcement of its discriminatory policy to preclude a family of three from renting a two-bedroom apartment illustrates the unlawful impact of Defendant's policy on families with children. A statistical comparison of the impact of Defendant's one person-per bedroom policy on households of three members <u>with</u> children present in the household as compared to households of three members <u>without</u> children in the household establishes that households <u>with</u> children are substantially more likely to be excluded from renting from Defendant, and thus affected by Defendant's occupancy policy, than households <u>without</u> children in each of the jurisdictions in which Plaintiffs reside and/or conducted their investigation activities.

92. For example, the properties FHCWM investigated and tested in Union Charter Township, Michigan (Copper Beach Mount Pleasant and The Reserve) are located in Isabella County. The Public Use Microdata Sample (PUMS) data for the Public Use Microdata Area (PUMA), geographic units used by the US Census for providing statistical and demographic information, containing Isabella County shows that three-person households with children are 2.5 times more likely to be precluded from renting a two-bedroom unit under Defendant's occupancy policy than a three person household without children.

93. Data for the properties FHCWM tested and investigated in Allendale, Michigan (for Copper Beach Allendale and 48 West), which is located in Ottawa County, also establish that households with children are substantially more likely to be excluded from renting from Defendant as a result of Defendant's occupancy policy than households without children. In that jurisdiction, three person households with children are 3.6 times more likely to be prohibited from renting a two-bedroom unit under Defendant's occupancy policy than a three-person household without children.

94. Similarly, the same data for Louisville, Kentucky demonstrates that three-person households with children are 4 times more likely to be unable to rent a two-bedroom unit under Defendant's occupancy policy than a three person household without children.

95. Finally, the data for Lexington also shows that Defendant's occupancy policy has a significantly disproportionate and adverse impact on households with children. According to PUMS data for Lexington, three-person households with children are 5 times more likely to be precluded from renting a two-bedroom unit under Defendant's occupancy policy than a three person household without children.

96. The substantial disparity between households with children and households without children is a direct and proximate cause of Defendant's unlawful occupancy policy.

97. Defendant has no legitimate business justification for its one-person per bedroom occupancy policy. Occupancy policies are generally, and lawfully, adopted to prevent overcrowding, but local occupancy codes are similarly enacted to prevent overcrowding and protect the health and safety of occupants of a dwelling. As detailed above, Defendant's policy operates to be significantly more restrictive than local occupancy codes in the jurisdictions in which Plaintiffs conducted their testing. Nor does the fact that Defendant markets itself as "student housing," which is not exempt from coverage under the Fair Housing Act, make its discriminatory policy any more legitimate. That is particularly the case given that Defendant does not strictly require enrollment in any college or university as a prerequisite for renting housing from it.

98. Upon information and belief, Defendant is aware that maintaining and enforcing a one-person per bedroom occupancy policy excludes a disproportionate percentage of households with children that could otherwise rent from Defendant. Defendant nonetheless has persisted in enforcing its discriminatory policy to limit or exclude families with children from renting housing.

99. Further, upon information and belief, Defendant has enforced its one-person per bedroom policy beyond those properties specifically referenced in this Complaint.


**<u>INJURY TO PLAINTIFFS</u>**

24

100. Defendant's conduct, as described above, has caused Ms. Moss injury, both emotional and financial.

101. As a direct, proximate, and foreseeable result of Defendant's discriminatory practices described above, Ms. Moss has suffered, and continues to suffer, irreparable loss and injury, including, but not limited to, humiliation, emotional distress, and the deprivation of her housing and civil rights. Further, she has sustained economic loss as a result of Defendant's conduct, namely by virtue of having to pay excess fees to lease an additional bedroom for her child.

102. As a direct, proximate, and foreseeable result of Defendant's discriminatory actions, as described above, the Organizational Plaintiffs have been required to expend significant staff time and incur expenses to identify the scope of Defendant's unlawful conduct and the breadth of its impact, and, furthermore, to take steps to counteract the detrimental effects of Defendant's conduct.

103. For example, each of the Organizational Plaintiffs conducted testing of Defendant, which required a significant expenditure of resources. Each Organization had to develop test profiles, conduct preliminary research on Defendant's operations to determine where tests could be conducted, prepare testers, and analyze test results.

104. The Organizational Plaintiffs also spent a significant amount of time researching and collecting information relevant to determine the extent of Defendant's discrimination, including floorplans for the properties that the respective organizations tested and investigated, research concerning restrictions imposed by any local occupancy codes, and Defendant's rental criteria, among other information. Further, the Organizational Plaintiffs devoted a significant amount of time to conduct research in order to draw comparisons between Defendant's occupancy policy and the requirements imposed by any applicable local code.

105. The Organizational Plaintiffs have also been forced to make out-of-pocket expenditures to conduct their investigation of Defendant's discriminatory acts and identify appropriate counteractive measures, including travel expenses and costs related to their data collection.

106. In addition, the Organizational Plaintiffs have expended, and will continue to have to expend, resources to counteract the effects of Defendant's discrimination by, among other things, conducting outreach to the community about Defendant's discrimination on the basis of familial status. These activities have required, and will continue to require, the expenditure of considerable financial resources and staff time.

107. For example, as part of their outreach efforts, the Organizational Plaintiffs have created and distributed advertisements in their respective service areas to educate the public on familial status discrimination. FHCWM, for example, ran print public service announcements on familial status discrimination in the Morning Sun, a Mount Pleasant newspaper, as well as in the Lanthorn, the student newspaper for Grand Valley State University in Allendale, Michigan. It also ran targeted Facebook advertisements to educate the public on familial status discrimination. LFHC similarly devoted significant staff time and resources to developing an advertising campaign to educate its service area about familial status discrimination that it published through its social media channels. NFHA used its limited resources to place advertisements to educate the public about familial status discrimination in two Louisville publications for two print cycles, develop digital advertisements on familial status discrimination, and distribute flyers to educate residents of Defendant's property in Louisville on familial status discrimination. The Organizational Plaintiffs have also counseled individuals on their rights under the Fair Housing Act as it relates to discrimination on the basis of familial status, including Plaintiff Maya Moss.

108. Because they have had to devote so much of their time and resources to investigate and counteract Defendant's discriminatory conduct, the Organizational Plaintiffs have had to forgo other projects that would have helped to further their respective missions. In other words, Defendant's discriminatory acts forced the Organizational Plaintiffs to divert their scant resources from other activities they sought to conduct.

109. In addition to the damages that they have suffered as a result of being required to divert their limited resources, Defendant's discriminatory acts have frustrated, and continue to frustrate, each Organizational Plaintiff's mission of ensuring that all people have equal access to housing opportunities in their respective service regions without having to confront unlawful discrimination on the basis of familial status. Defendant's violations of the Fair Housing Act directly impede the Organizational Plaintiffs' efforts, both in educating the public on their fair housing rights and in preventing discriminatory decision-making by housing providers, and has, accordingly, damaged their respective reputations.

110. The injury to the Organizational Plaintiffs' respective missions is a direct, proximate, and foreseeable result of Defendant's discrimination.

111. The Organizational Plaintiffs' investigation and counteraction of Defendant's conduct, their diversion of resources, and the frustration of their respective missions continue through the present, and will continue until Defendant's discriminatory conduct ceases and the harms caused by Defendant's actions are remedied. Defendant's discriminatory acts have injured, and continue to injure, the Organizational Plaintiffs.

112. Defendant's unlawful actions as described herein were, and remain, intentional, willful and knowing, and/or have been, and are, implemented with callous and reckless disregard for Plaintiffs' legal rights.

## CLAIM FOR RELIEF

## Federal Fair Housing Act

113. Plaintiffs reallege and incorporate by reference paragraphs 1-112, as if fully set forth herein.

114. Defendant's acts, policies, and practices intentionally discriminate against individuals on the basis of familial status.

115. Defendant's acts, policies, and practices have an adverse and disproportionate impact on families with children. This adverse and disproportionate impact is a direct result of Defendant's one-person per bedroom occupancy policy. Defendant's occupancy policy is not necessary to serve any substantial legitimate, nondiscriminatory interest.

116. Defendant injured Plaintiffs in violation of the FHA by committing the following discriminatory practices:

    a. Discriminating or otherwise making housing unavailable because of familial status, in violation of 42 U.S.C. § 3604(a);

    b. Discriminating in the terms, conditions, and privileges of the sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of familial status, in violation of 42 U.S.C. § 3604(b); and

    c. Making, printing, or publishing, or causing to be made, printed, or published, a statement with respect to the sale or rental of a dwelling that indicates a preference, limitation, or discrimination based on familial status, in violation of 42 U.S.C. § 3604(c).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Maya Moss, the Lexington Fair Housing Council, the Fair Housing Center of West Michigan, and the National Fair Housing Alliance pray that the Court grants the following relief:

a. Enter an order granting Plaintiffs' request for declaratory relief, finding that Defendant's actions violate the FHA.

b. Enter a permanent injunction and all other affirmative relief necessary enjoining Defendant and its affiliates, subsidiaries, agents, employees, and representatives, from continuing the illegal conduct described above, and further directing Defendant to take all affirmative relief necessary to remedy the effects of its past illegal conduct.

c. Award compensatory damages to each Plaintiff in an amount to be proved at a trial before a jury that would fully compensate Plaintiffs for the injuries alleged herein resulting from Defendant's unlawful discrimination.

d. Award punitive damages to each Plaintiff, in an amount to be proved at trial before a jury, that would punish Defendant for the willful, wanton, and reckless conduct alleged herein and that would effectively deter Defendant from engaging in similar conduct in the future.

e. Award Plaintiffs their reasonable attorneys' fees and costs.

f. Award such other and further relief as it deems just and equitable.


## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted,

/s/ Sara K. Pratt
Stephen M. Dane*
Sara K. Pratt
Jia M. Cobb*
RELMAN, DANE & COLFAX PLLC
1225 19th Street, NW
Washington, DC 20036
(202) 728-1888
(202) 728-0848 (fax)
spratt@relmanlaw.com
sdane@relmanlaw.com
jcobb@relmanlaw.com

*Attorneys for Plaintiffs*

Morgan Williams *
NATIONAL FAIR HOUSING ALLIANCE
1331 Pennsylvania Avenue, NW, Suite 650
Washington, DC 20005
Telephone: (202) 898-1661
mwilliams@nationalfairhousing.org

*Attorney for Plaintiff NFHA*

*pro hac vice applications to be filed*

Dated: July 24, 2018